UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Philip Charvat, on behalf of himself
and others similarly situated,

    Plaintiff,

v.

The Southard Corp., *et al.*

    Defendants.

Case No.: 2:18-cv-190
Judge Michael H. Watson
Magistrate Judge Vascura

## OPINION AND ORDER

Philip Charvat ("Plaintiff"), on behalf of himself and others similarly situated, sues The Southard Corporation ("Southard") and Renewal by Andersen LLC for alleged violations of the Telephone Consumer Protection Act ("TCPA"). Am. Compl. ¶ 1, ECF No. 28. Southard moves for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Mot., ECF No. 36. For the following reasons, the Court **GRANTS IN PART and DENIES IN PART** Southard's motion.

### I.    FACTS[1]

Plaintiff placed his telephone number on the National Do Not Call Registry ("NDNCR") more than five years before the time of the calls at issue in this lawsuit. Am. Compl. ¶ 22, ECF No. 28. Plaintiff alleges that Southard, acting on

---

[1] The Court accepts Plaintiff's factual allegations in the Amended Complaint as true for purposes of Southard's motion for judgment on the pleadings.

behalf of Renewal by Andersen LLC ("Renewal by Andersen"), nevertheless called Plaintiff's number to advertise goods and services. *Id.* ¶ 3. Southard is a dealer that sells Renewal by Andersen windows. *Id.* ¶ 18. Southard relies on telemarketing to generate new clients. *Id.* ¶ 19. Southard obtains leads for numbers to call, including Plaintiff's number, from Broadside Media. *Id.* ¶ 34.

The first call from Southard came on January 24, 2018. *Id.* ¶ 24. Plaintiff's wife answered the call. *Id.* ¶ 25. The caller asked for "Phil" and then the call disconnected. *Id.*

One minute later, Southard called Plaintiff's number again, and Plaintiff's wife once again answered. *Id.* ¶¶ 26–27. This time the caller identified himself as Matt with Renewal by Andersen, although he was actually calling from Southard, and claimed to be responding to an online inquiry for a window or door quote. *Id.* ¶¶ 27–28. Plaintiff's wife said she did not know of any request for a quote, and the call ended. *Id.* ¶ 27. Neither Plaintiff nor his wife ever submitted a request for a window or door quote. *Id.* ¶ 31.

Later on January 24, 2018, Southard called Plaintiff's number a third time. *Id.* ¶ 30. "The call was received at the Charvat home and rang nine times." *Id.*

The following day, January 25, 2018, Southard placed a fourth call to Plaintiff's number, which was answered by Plaintiff. *Id.* ¶¶ 35–36. Although the caller identified herself as Amy from Renewal by Andersen, she was calling from Southard. *Id.* ¶¶ 37–38.

Amy called back again the next day, January 26, 2018. *Id.* ¶ 46. On this call, Amy admitted that Plaintiff's contact information had been purchased from Broadside Media. *Id.* ¶ 49. Southard called again later on January 26th, but this call was unanswered. *Id.* ¶ 51.

On January 27, 2018, Plaintiff wrote to Renewal by Andersen regarding the calls and asked Renewal by Andersen "to disclose whether it had some explanation for the illegal telemarketing calls at issue." *Id.* ¶ 52. The letter was sent by U.S. mail and email, and it was received on the same day it was sent. *Id.*

The calls did not stop with the letter. On January 29, 2018, Plaintiff received a seventh call. *Id.* ¶ 53. The caller was "Gauge from Renewal by Andersen," and he attempted to sell Plaintiff replacement Andersen windows. *Id.* ¶¶ 54–55.

Plaintiff later received a response to his letter and email from Renewal by Andersen. *Id.* ¶ 56. The company identified Southard as having made the calls and claimed that Plaintiff had consented to the calls by visiting a website named www.renovationzone.com on January 24, 2018. *Id.* Southard later claimed that it was in fact Plaintiff's daughter who had visited the website. *Id.* ¶ 58. Neither Plaintiff nor his daughter ever visited the website. *Id.* ¶¶ 57–60. Southard later admitted that the alleged website visit never happened and the allegation that it had was based on a miscommunication with Broadside Media. *Id.* ¶ 61.

## II. STANDARD OF REVIEW

A motion for judgment on the pleadings under Rule 12(c) attacks the sufficiency of the pleadings and is reviewed under the same standard applicable to a motion to dismiss under Rule 12(b)(6). *See Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008). A claim survives a motion to dismiss under Rule 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). This standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [unlawful conduct]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (internal citations omitted). While the court must "construe the complaint in the light most favorable to the plaintiff," *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002), the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678.

## III. ANALYSIS

Southard moves for partial judgment on the pleadings. For purposes of this motion, Southard only challenges whether the fifth, sixth, and seventh calls were "telephone solicitations" in violation of the TCPA. Mot. 2, ECF No. 36. Southard alleges that on the fourth call, Plaintiff "made inquiries into Southard and its services" that, although apparently insincere, nevertheless created an "established business relationship" that exempted future calls from being considered "telephone solicitations." *Id.*

### A. The Regulatory Framework of the TCPA

The TCPA, via 47 U.S.C. § 227(c), directed the Federal Communications Commission ("FCC") to "initiate rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." Pursuant to that direction, the FCC has promulgated a number of rules governing telephone solicitations, several of which are relevant to this lawsuit. A National Do Not Call Registry was created, and no person or entity may initiate a telephone solicitation to a number that has registered with the NDNCR. 47 C.F.R. § 64.1200(c)(2). Any person who receives "more than one telephone call within any 12-month period by or on behalf of the same entity in violation of" the NDNCR may bring a private action to recover for actual monetary loss or for $500 in statutory damages for each violation, whichever is greater. 47 U.S.C. § 227(c)(5).

Certain calls are exempted from the definition of a "telephone solicitation," including calls "[t]o any person with whom the caller has an established business relationship." 47 U.S.C. § 227(a)(3); 47 C.F.R. § 64.1200(f)(14)(ii). An "established business relationship" ("EBR") means:

> a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber . . . on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party.

47 C.F.R. § 64.1200(f)(5).

### B. Did Southard and Plaintiff Form an EBR on One of the Calls?

Southard claims that Plaintiff made sufficient inquiries to create an EBR on the fourth, fifth, and seventh calls. Mot. 9–10, ECF No. 36. It is undisputed that Plaintiff never made a purchase or transaction with Southard in the eighteen months preceding the calls; therefore, there are essentially two parts of the definition of "established business relationship" at issue that Southard must be able to demonstrate by clear and convincing evidence. *See Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991*, 68 Fed. Reg. 44,144 (July 25, 2003) ("Any seller or telemarketer using the EBR as the basis for a telemarketing call must be able to demonstrate, with clear and convincing evidence, that they have an EBR with the called party."). First, Southard must show that the alleged relationship was "formed by a *voluntary*

two-way communication" between Southard and Plaintiff. 47 C.F.R. § 64.1200(f)(5) (emphasis added). Second, Southard must demonstrate that Plaintiff made an "inquiry or application regarding *products or services* offered by" Southard. *Id.* (emphasis added).

### 1. Were the communications between Southard and Plaintiff voluntary?

The primary dispute between the parties is whether the fourth, fifth, or seventh calls Southard made to Plaintiff can be considered "voluntary two-way communications" despite the fact that they were telephone solicitations in violation of the TCPA.

Plaintiff, naturally, argues that they were not voluntary because he "did not voluntarily call Southard. Southard illegally called" him. Opp. 9, ECF No. 40. Said differently, because Southard's calls were contrary to Plaintiff's explicit instructions not to call—by virtue of his registration on the NDNCR—they were not voluntary two-way communications.[2] *Id.*

Plaintiff also points out that an EBR "cannot be formed solely on the basis of a prior solicitation." Opp. 8, ECF No. 40 (quoting *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752 at ¶ 35). Southard argue this language is inapplicable in this case because it falls within the FCC's discussion of "Exemptions to Prohibited

---

[2] Plaintiff also argues that "a valid EBR requires the consumer to initiate the inquiry." Opp. 9, ECF No. 40. It is true that the inquiry must be made by the consumer, but that says nothing about whether the call may be initiated by another entity.

Uses of Artificial or Prerecorded Messages," Reply 6, ECF No. 44. It is not clear whether the exemption is limited to prerecorded messages as opposed to any telephone solicitation. In any event, in this case, any EBR would not have been "formed *solely* on the basis of a prior solicitation," it would have been formed on the basis of *an inquiry* that was made during a solicitation.

Surprisingly, the parties did not locate any court decision directly addressing the question of whether a call made in violation of the NDNCR can still constitute a "voluntary two-way communication" for purposes of the TCPA, and the Court has not located such a decision in its own research. Defendant cites to *Johansen v. Nat. Gas & Elec.*, No. 2:17-cv-587, 2018 U.S. Dist. LEXIS 138785 (S.D. Ohio Aug. 16, 2018), in which the Court found that the plaintiff's relationship with the defendant "appear[ed] to fit within" the definition of an EBR because the plaintiff, after missing an initial phone call from the defendant, called back "to express interest in its services and ultimately completed the enrollment process to seemingly become one of its electric customers." *Id.* at *2. But this case is unhelpful when determining what constitutes voluntariness because the plaintiff in that case actually called the defendant (after missing the initial call). *Id.* It is not alleged here that Plaintiff ever called Southard.

While not addressing the issue head on, some courts have implicitly found that a call initiated by a telemarketer can still be voluntary for purposes of creating an EBR. In *Morris v. Copart*, No. 4:15-CV-724, 2016 U.S. Dist. LEXIS 155755 (E.D. Tex. Nov. 9, 2016), the court found that the plaintiff established a

business relationship with the defendant by responding to an automated message asking the plaintiff to donate a vehicle. *Id.* at *2. The plaintiff responded that he was interested in donating and provided fake vehicle and personal information, allegedly to find out who was responsible for making the calls to his telephone number. *Id.* at *3. The plaintiff later received numerous calls, each "solely for the purpose of coordinating pickup of the vehicle," which the plaintiff had indicated he wished to donate. *Id.* at *31. The court found that the "[p]laintiff's false affirmation that he had a vehicle to donate established a business relationship, excusing subsequent calls made in furtherance of that business relationship and for the stated purpose of that relationship . . . ." *Id.* at *33.

Similarly, in *Hamilton v. Spurling*, No. 3:11-cv-102, 2013 U.S. Dist. LEXIS 38585 (S.D. Ohio Mar. 20, 2013), the plaintiff began receiving telemarking calls from various chiropractic offices after his wife was in a traffic accident. *Id.* at **3–4. The plaintiff claimed that the only way to get information about the entity calling was to set up an appointment with the chiropractor. *Id.* at *4. On the first call the defendant made to the plaintiff, the plaintiff's wife agreed to set up a chiropractic appointment. *Id.* at *34. The Court found that "[s]etting up the appointment constitutes an 'inquiry' or 'application' regarding chiropractic services," and that an EBR was created. *Id.* The Court did not specifically discuss whether the initial call was a voluntary two-way communication, but that is implicit in the Court's finding that an EBR existed.

Both *Morris* and *Hamilton* are similar to the present case in that the plaintiff seeking the protections of the TCPA chose to engage with the telemarketer to try to discover the caller's identity, but each call was initiated by the telemarketer.

The Court finds that the conversations between Plaintiff and Southard were "voluntary two-way communications." While it is unclear what that term was intended to add to the regulation over and above the simple existence of an inquiry or application, the Court sees no basis to determine that Plaintiff was forced into the ongoing communication with Southard. True, each of the calls violated the TCPA. But Plaintiff could have chosen to not engage in any communication at all—i.e. by hanging up. Alternatively, Plaintiff could have taken what is most likely the best course of action which is to inform the caller that Plaintiff's number is on the NDNCR and he does not wish to receive any more phone calls. It may be true that Plaintiff has trouble discerning the identity of telemarketers in order to bring lawsuits against them unless he feigns interest in their services, but this does not make an otherwise voluntary conversation involuntary.

### 2. Did Plaintiff inquire about Southard's products or services?

The parties disagree about whether Plaintiff ever inquired about Southard's products and services. The FCC has stated that "[t]he nature of an inquiry must . . . be such to create an expectation on the part of the consumer that a particular company will call them." 68 Fed. Reg. 44,144. "[A]n inquiry regarding a business's hours or location," for example, would not establish an EBR. *Id.*

Southard contends that Plaintiff inquired about Southard's products or services on the fourth call. Mot. 3–4, ECF No. 36. Here is a transcript of that call:

> Plaintiff ("PC"): Hello.
>
> Amy: Hi. This is Amy with Renewal by Andersen. Is Phil Available?
>
> PC: Yeah. This is him.
>
> Amy: Hi Phil. I was just calling to check in. I see here that you had a need for possible window replacement. If that is the case, I would love to set you for a free consultation with our company.
>
> PC: Uh. Well, maybe. Let me take some notes here.
>
> Amy: Okay.
>
> PC: Are you a local company?
>
> Amy: Yes, we have a showroom in Columbus.
>
> PC: Okay. Is this Andersen windows the same as the Anderson store or is this a different Andersen?
>
> Amy: Not exactly. We're Renewal by Andersen. We are the replacement division of Andersen Windows.
>
> PC: Oh. I gotcha. Okay. That Andersen.
>
> Amy: Yes.
>
> PC: There used to be an Anderson General Store or something like that.
>
> Amy: Oh. No. No. If you have just a couple of minutes I'd love to set you for a free consultation to see if we can help you.
>
> PC: Well, I like to check everything out if I can. Can I get your website address please?
>
> Amy: Um. Just a second. Sir. It's WeLoveOurNewWindows.com
>
> PC: Oh. Boy. We Love Our New Windows.
>
> Amy: Yes.

> PC: Okay. And I didn't catch your name please?
>
> Amy: My name is Amy.
>
> PC: Amy. And your phone number so I can call you back after I check you out?
>
> Amy: Our number here is 888 441 2402.
>
> PC: That's 888 441 2042.
>
> Amy: No. 2402. Sorry about that.
>
> PC: 2042.
>
> Amy: No 2402
>
> PC: Oh. 2402. I got up early today. I drive a school bus.
>
> Amy: I totally understand.
>
> PC: WeLoveOurWindows.com at 441-2402.
>
> Amy: Yes, sir.
>
> PC: Okay, let me check things out a little bit and --.
>
> Amy: All right. I'll be here all day.

Tr. Jan. 25, 2018 Call, ECF No. 19-1.

Plaintiff did not inquire about Southard's products or services on this call. Clearly, Plaintiff asked questions about Southard itself and was coy about whether or not he was interested in purchasing windows. However, at no time did Plaintiff actually ask about the windows themselves, installation, etc. Plaintiff's inquiries—e.g. asking for Southard's website address—are more akin to an inquiry about a business's hours or location, which the FCC has said is insufficient to create an EBR, 68 Fed. Reg. 44,144, than to a question about products and services. An EBR was therefore not created on the fourth call.

Plaintiff did, however, inquire about Southard's products and services on the fifth call on January 26. On that call Plaintiff asked "[h]ow long is the warranty on those [windows], in general?" Tr. Jan. 26 Call, 2:23–24, ECF No. 32-4. Asking about a product's warranty is unambiguously an inquiry about products or services. At this point, Plaintiff moved from inquiries geared towards discovering Southard's identity to a seemingly legitimate question about what was being marketed. This was sufficient to create an EBR on the fifth call. Therefore, Southard's calls made after the fifth call on January 26, 2018, did not violate the TCPA.

## CONCLUSION

For these reasons, the Court **GRANTS IN PART and DENIES IN PART** Southard's motion for partial judgment on the pleadings. Plaintiff's TCPA claims on the basis of Southard's sixth and seventh calls are barred because Plaintiff created an established business relationship on the fifth call by voluntarily inquiring into Southard's products and services. The Clerk is **DIRECTED** to terminate ECF No. 36 from the Court's pending motions list.

**IT IS SO ORDERED.**

*/s/ Michael H. Watson*
**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**